**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | )  Criminal No. 1:24-cr-10200-RGS |
| | ) |
| v. | )  **ORAL ARGUMENT REQUESTED** |
| | ) |
| DEV ANANTH DURAI, | ) |
| a/k/a "Devah," | ) |
| | ) |
| Defendant. | ) |

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT DEV ANANTH DURAI'S MOTION**
**TO SECURE ENTRY INTO THE UNITED STATES**


Eric S. Rosen
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, MA 02110


Robert Fisher
**NIXON PEABODY LLP**
Exchange Place
53 State Street
Boston, MA 02109


*Counsel for Defendant Dev Ananth Durai*

i

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ALLEGATIONS IN THE SUPERSEDING INDICTMENT ....................................................... 2

    I.    The Alleged Scheme and Its Architects ........................................................... 2

    II.   The Scheme's Operation Before Durai's Alleged Entry ................................... 3

    III.  Durai's Alleged Entry into the Conspiracy ...................................................... 4

    IV.  The Specific Trading Allegations Against Durai .............................................. 5

    V.   The Money Laundering Allegations Against Durai ........................................... 7

MR. DURAI'S ATTEMPTS TO ENTER THE UNITED STATES TO ANSWER THE
CHARGES AGAINST HIM ...................................................................................................... 8

ARGUMENT ............................................................................................................................ 13

    I.    Under well-settled law, Mr. Durai is Not a Fugitive ....................................... 13

    II.   The Government's Refusal to Facilitate Mr. Durai's Appearance Violates His Fifth and
Sixth Amendment Rights. .......................................................................................... 15

        A.   The Government's conduct violates the Fifth Amendment. ......................... 15

        B.   The Government's conduct violates the Sixth Amendment. ........................ 17

    III.  The Government's conduct violates Mr. Durai's right to a speedy trial. .......... 19

    IV.  This Court has authority to order the Government to facilitate Mr. Durai's appearance. 21

    V.   This Court Should Dismiss or Stay the Prosecution. ....................................... 23

        A.   This Court's supervisory powers warrant dismissal. ................................... 24

        B.   In the alternative, this Court should stay the prosecution. ........................... 25

CONCLUSION ......................................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barker v. Wingo*,
   407 U.S. 514 (1972) .................................................................................. 20, 21

*Bower v. El-Nady*,
   844 F. Supp. 2d 191 (D. Mass. 2012)............................................................ 15

*Degen v. United States*,
   517 U.S. 820 (1996) ....................................................................................... 23

*Dirks v. SEC*,
   463 U.S. 646 (1983) ....................................................................................... 19

*Doggett v. United States*,
   505 U.S. 647 (1992) ....................................................................................... 20

*Hamilton v. Alabama*,
   368 U.S. 52 (1961) ......................................................................................... 25

*Illinois v. Allen*,
   397 U.S. 337 (1970) ....................................................................................... 17

*Maine v. Moulton*,
   474 U.S. 159 (1985) .................................................................................. 17, 18

*Merritt v. Hunter*,
   170 F.2d 739 (10th Cir. 1948) ....................................................................... 24

*Simmons v. United States*,
   390 U.S. 377 (1968) ....................................................................................... 15

*Smith v. Hooey*,
   393 U.S. 374 (1969) .................................................................................. 20, 21

*Texas v. Cobb*,
   532 U.S. 162 (2001) ....................................................................................... 17

*U.S. v. 939 Salem Street, Lynnfield, MA*,
   No. 10-11845-RGS, 2011 WL 3652525 (D. Mass. 2011)............................. 13

*United States v. Bardakova*,
   145 F.4th 231 (2d Cir. 2025) ..................................................................... 13, 14

*United States v. Barrera-Moreno*,
   951 F.2d 1089 (9th Cir. 1991) ....................................................................... 24

iii

*United States v. Bescond*,
  24 F.4th 759 (2d Cir. 2021) ................................................................. 13

*United States v. Boskic*,
  545 F.3d 69 (1st Cir. 2008) .................................................................. 17

*United States v. Burden*,
  934 F.3d 675 (D.C. Cir. 2019) .............................................................. 16

*United States v. Castillo*,
  537 F. Supp. 3d 120 (D. Mass. 2021) ...................................... 16, 19, 22, 24

*United States v. Donnelly*,
  41 F.4th 1102 (9th Cir. 2022) .............................................................. 26

*United States v. El Naddaf*,
  662 F. Supp. 3d 108 (D. Mass. 2023) .................................................... 22

*United States v. Escobedo-Molina*,
  790 F. Supp. 3d 1283 (D.N.M. 2025) ........................................... 18, 24, 25

*United States v. Galvan-Orea*,
  766 F. Supp. 3d 740 (E.D. Mich. 2024) ................................................. 24

*United States v. Guimaraes*,
  No. 1:25-CR-10129-JEK, 2025 WL 1899046 (D. Mass. Jul. 9, 2025) ......... 18, 19, 24

*United States v. Hasting*,
  461 U.S. 499 (1983) ........................................................................... 24

*United States v. Hernandez*,
  504 Fed. Appx. 647 (9th Cir. 2013) ...................................................... 15

*United States v. Hijazi*,
  845 F. Supp. 2d 874 (C.D. Ill. 2011) ..................................................... 22

*United States v. Kashamu*,
  15 F. Supp. 3d 854 (N.D. Ill. 2014) ...................................................... 18

*United States v. Linarez-Lugo*,
  No. 2025-CR-0006, 2026 WL 370852 (D.V.I. Feb. 10, 2026) ................... 25

*United States v. Maldonado Rodriguez*,
  No. 25-cr-116-JJM-AEM, 2026 WL 84241 (D.R.I. Jan. 12, 2026) ........... 16, 19, 25

*United States v. Marion*,
  404 U.S. 307 (1971) ........................................................................... 20

*United States v. McConahy*,
   505 F.2d 770 (7th Cir. 1974) ................................................................................ 21

*United States v. Moussaoui*,
   382 F.3d 453 (4th Cir. 2004) ................................................................................ 22

*United States v. Osorio-Arellanes*,
   112 F.4th 647 (9th Cir. 2024) ............................................................................... 17

*United States v. Parias*,
   No. CR 25-00904-FMO, 2025 WL 3749406 (C.D. Cal. Dec. 27, 2025).............................. 17, 24

*United States v. Perez-Canez*,
   No. 18-00229-PHX, 2020 WL 1000029 (D. Ariz. 2020)........................................................ 25

*United States v. Rodriguez*,
   No. 4:25CR3041, 2026 WL 92922 (D. Neb. Jan. 13, 2026) ...................................... 18

*United States v. Rowbotham*,
   430 F. Supp. 1254 (D. Mass. 1977)........................................................................ 22

*United States v. Salzmann*,
   417 F. Supp. 1139 (E.D.N.Y. 1976)....................................................................... 21

*United States v. Sidoo*,
   No. 19-10080-NMG (D. Mass.) ............................................................................. 23

*United States v. Tamup-Tamup*,
   No. 25-cr-0066, 2025 WL 2662293 (D.R.I. Sept. 17, 2025)............................... 22, 25

*United States v. Theresius Filippi*,
   918 F.2d 244 (1st Cir. 1990)................................................................................. 21

*United States v. Urizar Lopez*,
   587 F. Supp. 3d 835 (S.D. Iowa 2022) ............................................................. 17, 25

*United States v. Vorley*,
   No. 18-cr-35 (N.D. Ill.)........................................................................................ 23

## **Statutes**

8 U.S.C. § 1182(d)(5) ............................................................................ 10, 14, 26, 27

18 U.S.C. § 1956(h) .................................................................................................. 7

18 U.S.C. § 3142........................................................................................................ 16

U.S. Const. Amend. VI............................................................................................. 18

**<u>Rules</u>**

Fed. R. Crim. P. 10(a) ................................................................................................. 25

Fed. R. Crim. P. 12(b)(1) ............................................................................................. 22

Fed. R. Crim. P. 48(b) ....................................................................................... 22, 23, 24

**INTRODUCTION**

The United States government indicted Dev Ananth Durai, but now has refused to let him answer the charges. For more than five months, Mr. Durai has been under indictment in this District. He has not been arraigned. He has not had a bail hearing. He has not attended a single proceeding. The reason is not that he has fled or refused to appear, it is that the Government will not let him into the country.

Within weeks of the Indictment's unsealing, Mr. Durai retained U.S. counsel, initiated discussions with the Government, and proposed multiple concrete mechanisms for voluntary surrender including: a $75,000 surety bond, GPS monitoring, passport surrender, and self-funded travel to Boston. The Government rejected every proposal. It revoked his travel authorization. It refused to withdraw the arrest warrant that prevents him from boarding a flight. It conditioned his entry into the United States on a single thing: his agreement to cooperate, unconditionally, with the prosecution. When Mr. Durai declined to waive his constitutional rights as the price of admission, the Government labeled him a "fugitive" and shut the door.

The result is a constitutional violation that the Government has engineered and now seeks to exploit. Mr. Durai cannot exercise his Sixth Amendment right to appear at proceedings, consult meaningfully with counsel, or prepare a defense. The Speedy Trial Act's 70-day clock has never started—because the Government has blocked the event that triggers it. And the Government has converted its own refusal to allow him into the U.S. into a basis for calling Mr. Durai a fugitive, a label that could strip him of the right to challenge the Indictment at all.

This Court has the authority to intervene, and should intervene. Mr. Durai respectfully asks the Court to order the Government to facilitate his entry into the United States for presentment,

1

arraignment, and all further proceedings, or, in the alternative, to dismiss or stay the Indictment until the Government complies with its constitutional duty to bring the accused to trial.

**ALLEGATIONS IN THE SUPERSEDING INDICTMENT**[1]

### I.    The Alleged Scheme and Its Architects

Dev Durai is the last of eight defendants named in the Superseding Indictment (the "Indictment") returned under seal on November 4, 2025. Dkt. 43 at 1. He is a Singapore citizen and resident. (*Id.* ¶8.) He was not in the United States at any time relevant to the charged conduct. The scheme the Government alleges—a multi-year insider trading network rooted in the French corporate world—was conceived, organized, and operated by others, in other countries, more than a year before Durai is alleged to have received a single tip.

The eight defendants are all foreign nationals. The Indictment alleges that the conspiracy originated no later than November 2016, when defendants Samy Fadi Khouadja and Eamma Safi recruited defendant Zhi Ge to join the scheme. (*Id.* ¶¶1–3, 49.) Khouadja lived in France and the United Arab Emirates ("UAE"); Safi lived in the UAE and Germany; Ge lived in Singapore. (*Id.* ¶¶ 1–3.) Defendants Christophe Dong and Julien Liu, who mediated Durai's participation, lived in France and Hong Kong, respectively. (*Id.* ¶¶ 4–5.) Defendant Patrick Chou lived in France and Hong Kong; defendant Cheuk Yue Lee lived in Hong Kong. (*Id.* ¶¶ 6–7.)

The Indictment does not specifically allege a source of all the inside information; however, one potential alleged source of some of the inside information is an individual identified as "CC-2," a French national who worked in the mergers-and-acquisitions departments of two publicly traded French companies, Atos S.E. and Worldline S.A. (*Id.* ¶10.) CC-2 lived in France. (*Id.*) CC-

---

[1] The following summary is drawn solely from the allegations in the Superseding Indictment. Mr. Durai, of course, reserves all rights to challenge the government's case and the factual allegations in the Indictment.

2 had previously worked at the same investment bank as Khouadja and was an investor in a Paris restaurant owned by Khouadja and Safi. (*Id.*) The restaurant served as the scheme's social and operational hub. (*Id.* ¶¶ 50, 85, 90.)

The alleged conspiracy operated through a tiered MNPI pipeline: CC-2 provided inside information to Khouadja; Khouadja passed it to Safi; Safi passed it to Ge; and Ge distributed it across a network of traders, including Liu and Dong. (*Id.* ¶¶ 45–47.) Durai received tips from Liu and Dong—at least two steps removed from Ge and at least four steps removed from the alleged insider source. (*Id.* ¶¶105, 116, 154, 179, 183, 187, 209.) The Indictment does not allege that Durai ever communicated with Khouadja, Safi, CC-2, or any person in Europe in connection with the alleged scheme. The tippage chain ran: CC-2 → Khouadja → Safi → Ge → Liu/Dong → Durai.

## II.    The Scheme's Operation Before Durai's Alleged Entry

The Indictment charges a conspiracy that ran from at least November 2016 through at least February 2024. (*Id.* ¶45.) Durai is not alleged to have played any role in the scheme's founding, its organizational structure, or any of its first eight alleged transactions, which are documented across hundreds of paragraphs of the Indictment.

In November 2016, Safi and Khouadja recruited Ge in Paris, established their coded communications protocols—using the term "running" for insider trading, "greens" for money, "socks" for SIM cards, and "shoes" for cell phones—and began distributing MNPI to a growing network of traders. (*Id.* ¶¶49–61.) By the time of the first alleged successful trade—the Banvit acquisition by BRF S.A. in January 2017—the conspiracy had already recruited multiple co-conspirators, distributed MNPI across that network, and established the profit-sharing arrangements that would govern payments throughout the scheme. (*Id.* ¶¶ 53–70.)

3

The scheme expanded substantially in 2017 and early 2018, again without Durai. In March 2017, Khouadja, Safi, and Ge recruited cooperating witness CC-1, a U.S.-based trader, by providing him with MNPI regarding the anticipated acquisitions of Kindred Healthcare and Pinnacle Foods. (*Id.* ¶¶71–74.) By June 2017, the scheme had consummated trades in Kindred, Pinnacle, and Advisory Board Company securities. (*Id.* ¶¶73–95.) By the end of 2017, Ge and Safi had distributed MNPI regarding the acquisition of Gemalto N.V. to CC-1, Liu, and others, all of whom then traded. (*Id.* ¶¶96–101.) In the first half of 2018, the scheme executed trades in Syntel—the first transaction in which Durai allegedly participated. (*Id.* ¶¶102–105.)

At no point during any of these transactions does the Indictment allege that Durai played any role. He did not recruit CC-2 or any other participant. He did not establish or maintain the burner phone and SIM card protocol that the scheme's founders used to evade detection. (*Id.* ¶¶ 47(f), 56–58.) He did not create the shell company—Belleby Holdings Pte Ltd.—that Ge used to receive and launder trading proceeds. (*Id.* ¶¶ 113, 235.) He did not set the profit-sharing terms that governed the scheme's financial relationships. (*Id.* ¶¶ 91, 109.)

### III.    Durai's Alleged Entry into the Conspiracy

Paragraph 105 alleges that on or about July 2, 2018—approximately twenty months after the scheme allegedly began—"DURAI began purchasing Syntel securities while in possession of MNPI." (*Id.* ¶ 105.) The Indictment does not allege how Durai received the Syntel tip. It does allege that Liu caused a brokerage account he controlled to begin purchasing Syntel securities on the same day. (*Id.* ¶104.) The Indictment's next reference to Durai is a message exchange he had with Liu on August 17, 2018, inquiring about the timing of the "next deal" and stating, "I need to prepare the firepower." (*Id.* ¶108.)

4

The Indictment's allegations against Durai reflect a role confined to two functions: trading on tips he received from Liu and Dong, and passing those tips on one or two occasions to CC-12, a Singapore-based associate. He is not alleged to have received tips directly from Ge, Safi, or Khouadja. He is not alleged to have attended any meetings in Paris or anywhere else in Europe to plan or coordinate the scheme. He did not recruit other participants. He did not negotiate or set any financial arrangements. He did not use burner phones or exchange SIM cards. All of his alleged trading was conducted from outside the US, primarily in Singapore.

## IV.    The Specific Trading Allegations Against Durai

The Indictment identifies seven transactions in which Durai is alleged to have traded: Syntel (July 2018), Atos negative profit warning (October 2018), Atos/Worldline spinoff (January 2019), Ingenico (October 2019), Wright Medical (November 2019), Walgreens (November 2019), and Alexion (August 2020). For each transaction, the Indictment alleges that Durai "purchased" or "began purchasing" securities "while in possession of MNPI," but provides no further details. The Indictment does not allege the dollar amounts of Durai's trades for most of these transactions.

**Syntel, Inc. (July 2018)**: On or about July 2, 2018, Durai "began purchasing Syntel securities while in possession of MNPI." (*Id.* ¶105.) The Indictment does not specify how Durai obtained the Syntel MNPI. The immediately preceding and subsequent paragraphs concern CC-1's Syntel trading and an August 2018 cash payment CC-1 made to Safi in Vienna—conduct entirely separate from Durai. (*Id.* ¶¶103, 107.)

**Atos Negative Profit Warning (October–November 2018)**: The Indictment alleges that on or about October 20, 2018, Dong received MNPI from Khouadja that Atos would announce a negative profit warning, and that Dong then "tipped DURAI" with that information the same day. (*Id.* ¶ 116.) Dong and Durai exchanged messages in which Dong advised Durai that the stock

"will go down 10%" on the day of the announcement, told him to "short" the stock, and offered Durai a 10% commission for the execution of trades. (*Id.* ¶¶116–118.)

The next day, Dong sent Durai a voice message stating that Dong's source "said it's sure" and that "the result is not nice at all, so it will go down 10% when they show the results." (*Id.* ¶ 119.) The day after, Durai began purchasing Atos put options while in possession of MNPI. (*Id.* ¶ 120.) That same day, Durai told CC-12 the Atos MNPI, stating in encrypted messages that "they announcing tomorrow before market open" and "everything sell tomorrow." (*Id.* ¶121.) On October 23, 2018, following Atos's announcement, Durai messaged CC-12: "See | Don't say I never give you winning trades | 25% in one day" and "I made quarter mill USD." (*Id.* ¶124.) On October 26, 2018, Dong forwarded to Durai a Khouadja Telegram message regarding a separate deal. (*Id.* ¶¶ 125–126.) Durai responded by asking Dong for specifics and consulting Liu about whether to proceed. (*Id.* ¶¶127–129.) No trading ensued.

**Atos/Worldline Spinoff (January–February 2019):** On January 24, 2019, Dong sent Durai a message directing him to "play atos." (*Id.* ¶148.) On January 28, 2019, Durai asked Dong: "Atos buy before 30th?" Dong responded: "Yes before 30." (*Id.* ¶ 151.) That same day, Durai messaged CC-12 that he had "new info," directing CC-12 to meet him in Macau. (*Id.* ¶ 152.) When CC-12 asked whether he could share the Atos MNPI with his sibling, Durai responded: "No need la | Can you relax | Keep it a secret." (*Id.* ¶153.) On January 29, 2019, Durai began to purchase Atos securities while in possession of MNPI. (*Id.* ¶154.) On January 30, 2019, Dong sent Durai a message: "Atos" plus an emoji. (*Id.* ¶156.) Separately, on January 17, 2019, Durai attempted to send more than $100,000 to a company bank account controlled by Dong. The transaction was rejected by the bank because it required an invoice. Dong responded by sending Durai a sham loan agreement. (*Id.* ¶ 236.)

6

**Ingenico Group S.A. (October 2019)**: On October 22, 2019, Durai sent Liu a message: "Pls give me some good tips." Liu responded: "Telegram." (*Id.* ¶186.) On October 23, 2019, Durai purchased Ingenico securities while in possession of MNPI. (*Id.* ¶187.) The MNPI concerned Worldline's planned acquisition of Ingenico. (*Id.* ¶¶184–188.) Around the same time, Durai directed CC-12 to open a separate brokerage account. (*Id.* ¶¶ 190–192.)

**Wright Medical Group, N.V. (November 2019)**: On November 1, 2019, Durai purchased Wright Medical securities while in possession of MNPI (without specifying the source). (*Id.* ¶179.) The Indictment alleges that Safi tipped CC-1 with Wright Medical MNPI that same day. (*Id.* ¶ 177.)

**Walgreens Boots Alliance, Inc. (November 2019):** On November 4, 2019, Durai purchased Walgreens stock while in possession of MNPI (without specifying the source) (*Id.* ¶ 183.) The Indictment alleges that Safi tipped CC-1 with Walgreens MNPI on the same day, and that Liu also purchased Walgreens securities. (*Id.* ¶¶ 180, 182.)

**Alexion Pharmaceuticals Inc. (August 2020)**: On August 31, 2020, Durai purchased Alexion securities while in possession of MNPI. (*Id.* ¶ 209.) The Indictment alleges that Safi had informed Ge of the Alexion MNPI on August 21, 2020, and that Ge and Lee were purchasing Alexion securities as of August 28, 2020, three days before Durai's alleged purchases. (*Id.* ¶¶ 200–208.)

## V.    The Money Laundering Allegations Against Durai

The Indictment charges Durai in Count Five (Money Laundering Conspiracy, 18 U.S.C. § 1956(h)). (*Id.* ¶ 75.) The Indictment identifies two money laundering-related transactions involving Durai. *First*, on October 16, 2018, Liu asked Durai to receive €60,000 that Liu was sending from Europe, and to re-transfer that amount to Ge's shell company, Belleby Holdings Pte

Ltd., in Singapore. Liu explained that the money was needed "asap" to pay Ge. (*Id.* ¶ 112.) Durai agreed and confirmed the transfer. (*Id.* ¶ 113.) On the same day, Liu executed two wire transfers totaling €60,000 to Durai's Singapore bank account. (*Id.*) This transaction is an overt act in furtherance of the money laundering conspiracy. (*Id.* ¶ 234.)

*Second*, on January 17, 2019, Durai attempted to send more than $100,000 to a company bank account Dong controlled. The bank in Hong Kong rejected the transfer, stating it required an invoice. Durai messaged Dong: "They want an invoice to show that I'm paying for something | Money laundering laws." Dong responded by sending Durai a sham loan agreement. (*Id.* ¶ 236.)

<u>**MR. DURAI'S ATTEMPTS TO ENTER THE UNITED STATES
TO ANSWER THE CHARGES AGAINST HIM**</u>[2]

As described, Mr. Durai is a Singapore citizen. (*Id.* ¶ 8.) He was not in the United States at any time relevant to the charged conduct. Mr. Durai relocated to Hong Kong for work in 2023. Since then, he has traveled (primarily for work) extensively and regularly across Asia and Europe for business. In 2025 alone, Mr. Durai traveled 25 times to Hong Kong, 13 times to Mainland China, five times to Japan and South Korea, and additional trips to Europe, Thailand and Taiwan. *See* Rosen Decl. Ex. H.

Mr. Durai was not in the United States when the Indictment was unsealed on November 18, 2025. He was not a fugitive from any jurisdiction in which he resided or was present. Rather, upon learning of the Indictment, Mr. Durai, shortly thereafter, flew from Singapore's Changi Airport to China, a country he had already traveled to 13 times that year and where he travels frequently for work. No arrest warrant had been lodged against him in Singapore. No Interpol Red Notice had been issued. No request had been made to Singapore authorities to detain him, flag his

---

[2] The facts in this section are drawn from the Declaration of Eric S. Rosen, dated April 14, 2026, which accompanies this motion ("Rosen Decl.").

passport, or restrict his travel before his departure from Changi Airport. Mr. Durai was allowed to travel to China because there was nothing restricting his travel.

After arrival in China, Mr. Durai immediately retained U.S. counsel. On December 3, 2025, counsel contacted the Government less than two weeks after the November 18, 2025 unsealing to initiate discussions regarding voluntary surrender to face the charges. *See* Rosen Decl. Ex. A. Because Mr. Durai is not a U.S. citizen, he needs permission to travel to the United States. Typically, and as he had in the past when traveling to the United States, Durai would obtain an ESTA visa to facilitate travel. However, soon after being indicted, and in the hopes of coming to the United States to face the charges, Mr. Durai learned that he no longer had authorization to travel to the US, and could not obtain such permission to enter the US without help from the prosecutors.

From the outset after being retained, Government counsel repeatedly asked that Mr. Durai come to the United States and cooperate. In multiple telephone calls, the Government indicated it could facilitate Mr. Durai's entry without extradition, but conditioned that facilitation on his agreement to cooperate. When Mr. Durai did not agree to unconditionally cooperate prior to the review of any discovery, the Government withdrew that option and declined to provide any alternative mechanism for lawful entry.

On January 13, 2026, defense counsel met with the assigned prosecutors at the United States Attorney's Office in Boston. Counsel proposed a bail package that included a $75,000 secured bond, voluntary self-surrender at a U.S. port of entry, surrender of travel documents, GPS monitoring, travel restricted to the Eastern Seaboard, regular reporting to Pretrial Services, and no contact with co-defendants or witnesses. The Government stated that it considered Mr. Durai a

fugitive and took the position that the only acceptable path for him to appear was extradition from Singapore.

On January 20, 2026, the Government via e-mail rejected Mr. Durai's proposed voluntary surrender. It refused to withdraw the arrest warrant, refused to permit self-surrender, refused to agree to any bail conditions, refused to coordinate with Customs and Border Protection regarding Mr. Durai's ESTA authorization, and refused to support parole into the United States under 8 U.S.C. § 1182(d)(5). The Government described Mr. Durai as a "fugitive" who "fled his home country to a non-extradition country" and who was "attempting to leverage his status as a fugitive . . . to obtain concessions from the government." *See* Rosen Decl. Ex. B. However, in a separate phone call, the prosecutors made clear that Mr. Durai could come to the United States if he agreed, in advance, to cooperate.

Multiple further communications were sent by defense counsel to the Government in an attempt to allow Mr. Durai into the United States to answer the charges against him. On February 3, 2026, defense counsel wrote to the criminal chiefs of the United States Attorneys' Office. *See* Rosen Decl. Ex. C. The letter provided two specific mechanisms for voluntary appearance: managed self-surrender coordinated with the United States Marshals Service and Customs and Border Protection, or, in the alternative, parole into the country under 8 U.S.C. § 1182(d)(5), for the limited purpose of entry, immediate surrender, and court appearance.[3] The letter explained that Mr. Durai was not a fugitive because there was nothing preventing him from traveling outside of Singapore after the unsealing of the Indictment, and further, he *wants to come* to the United States to face the charges. The letter cited multiple cases of foreign national defendants who had been

---

[3] Parole is a statutory mechanism for entry in circumstances involving significant public benefit, but it requires government coordination.

10

allowed to come into the country from abroad to face charges that were unsealed while they were located abroad.

On February 20, 2026, the DOJ, in a letter signed by the criminal division chief, again refused to allow Mr. Durai to come to the United States. The letter characterized the defense's requests—that the Government not seek pretrial detention, permit supervised self-surrender, and seek parole from DHS—as an attempt to extract "concessions" and "benefits" in exchange for Mr. Durai's appearance, apparently viewing a defendant's appearance in his own criminal case as a privilege to be earned. The Government claimed that Mr. Durai "has already fled and has been a fugitive for approximately three months" even though, as set forth above, there was nothing preventing him from leaving Singapore at the time he departed and Mr. Durai had been seeking for months to enter the United States to answer the charges. *See* Rosen Decl. Ex. D. The letter failed to provide any options for Mr. Durai to enter the United States, save for returning to Singapore and waiving extradition: "If the Defendant surrenders promptly to authorities in Singapore and waives extradition, we will seek his prompt transfer to the United States." *Id*.

The letter did not acknowledge that the Government had revoked Mr. Durai's ESTA authorization—the very barrier that prevented him from boarding a plane to the United States. Although the DOJ promised to promptly seek his "transfer to the United States," as the Government well knew, this would take months. Singapore law generally mandates that those undergoing extradition be detained in harsh conditions pending extradition, as exemplified by co-defendant Ge's experience (who has been detained in Singapore awaiting extradition for more than 18 months). Thus, the Government was presenting Mr. Durai with a binary choice: travel to the U.S. but only if he agreed in advance to cooperate *or* return to Singapore and be detained in horrific conditions for months pending extradition.

11

Unwilling to give up, defense counsel wrote *again* on March 7, 2026, this time to the deputy criminal chief. In the email, defense counsel asked simply for a parole into the country. The only "ask" in the email was to do the paperwork so that Mr. Durai could board the plane and come to the United States and be presented to a Magistrate Judge. The email did not ask the DOJ to agree to any type of bond package. In essence, Mr. Durai was asking to appear with "no strings attached." *See* Rosen Decl. Ex. E. This proposal was rejected again in a March 16, 2026 phone call with the criminal division chiefs, who provided no reasoning for their decision other than to state that there was "nothing new."  However, the next day in an email, the defense pointed out that its proposal *was* new—the proposal did not request a bail package—and further complained that Mr. Durai was, in effect, being punished for not agreeing to cooperate pre-discovery with very little information available about the case. *See* Rosen Decl. Ex. F. The government rejected those points in a March 19, 2026 email, stating that a U.S. arrest warrant had been issued for Mr. Durai at the time he flew to China, and further stating, inaccurately, that it was Mr. Durai (and not the government) who was the person who had proposed cooperation. *See* Rosen Decl. Ex. G.

In sum, Mr. Durai has taken every available step to submit to this Court's jurisdiction yet the Government is thwarting his ability to do so. The Government unsealed the Indictment, knowing Mr. Durai was abroad and had no pending process in Singapore. Mr. Durai's ESTA travel authorization was then revoked (first changed to "administrative processing," and most recently to "Travel Not Authorized"), which prevented him from flying to the United States. When defense counsel requested a mechanism for voluntary surrender, the Government refused every proposed path: warrant withdrawal, self-surrender coordination, consular visa, or CBP parole. The Government has labelled Durai a "fugitive" who "fled his home country to a non-extradition country," and asserts that his inability to appear justifies the Government's refusal to engage.

12

## ARGUMENT

### I.    Under well-settled law, Mr. Durai is Not a Fugitive

The Government has told the defense that Mr. Durai is a fugitive—and therefore potentially subject to the fugitive disentitlement doctrine—because he left Singapore after being indicted and traveled to China, a country where he travels frequently for work. Put simply, the Government is wrong.

In this situation, where Mr. Durai was outside the United States at the time of charges, Mr. Durai could qualify only as a "constructive flight fugitive," which is a person who "allegedly committed crimes while in the United States" but "was outside the country—for whatever reason—when [he] learned that [his] arrest was sought and who then refused to return to the United States in order to avoid prosecution." *United States v. Bardakova*, 145 F.4th 231, 242 (2d Cir. 2025).[4] Mr. Durai is not a constructive-flight fugitive. As this Court has recognized, that requires a showing that the defendant "learned that [his] arrest[] was sought and . . . then refused to return to the United States in order to avoid prosecution." *U.S. v. 939 Salem Street, Lynnfield, MA*, No. 10-11845-RGS, 2011 WL 3652525, at *3 (D. Mass. 2011) (rejecting government's request to invoke fugitive disentitlement doctrine despite the government amassing "significant circumstantial evidence" that the defendant has "willfully refused to enter the United States….").

Mr. Durai has done the opposite. Within weeks of the Indictment's unsealing, he retained U.S. counsel, initiated discussions with the Government, and proposed multiple concrete mechanisms for voluntary surrender—including managed self-surrender coordinated with the U.S.

---

[4] A "traditional fugitive" is a person who "flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district." *See, e.g., United States v. Bescond*, 24 F.4th 759, 771 (2d Cir. 2021). Mr. Durai clearly does not qualify as the U.S. courts have no jurisdiction in Singapore and Mr. Durai did not conceal himself in Massachusetts (the district where the crime allegedly was committed).

Marshals and CBP, parole under 8 U.S.C. § 1182(d)(5), and ultimately an unconditional request to be paroled into the country and presented to a Magistrate Judge. Far from refusing to return, he has taken every available step to submit to this Court's jurisdiction. The Government rejected each proposal.

To the extent that it matters (it does not), Mr. Durai did *not* flee Singapore for China. At the time he flew to China, no arrest warrant had been lodged against him in Singapore, no Interpol Red Notice had been issued, no request had been made to restrict his travel, and no extradition process had been initiated.[5] He departed through Changi Airport—one of the most security-sensitive transit hubs in the world—without incident. Had any legal process been in place, he would not have cleared customs. He did not evade process, because there was no process to evade. Moreover, his travel to China was lawful, voluntary, and consistent with a years-long pattern of regular business travel. In 2025 alone, Mr. Durai crossed international borders more than 70 times, including thirteen separate entries into mainland China before the Indictment was unsealed. *See* Section VII, *supra*; Rosen Decl. Ex. H. Put simply, a foreign national who retains experienced local counsel and continues his ordinary life while his lawyers engage in active dialogue with prosecutors is not fleeing. He is exercising his legal rights and navigating a complex situation with the assistance of counsel.

And unlike the defendant in *Bardakova*, who "had not identified any explanation for why she could not return to the United States," *id*. at 245–46, Mr. Durai has spent months proposing concrete mechanisms for his appearance, and has identified a specific, documented barrier. His ESTA authorization has been revoked, and the Government has refused every proposed alternative for entry. The Government has offered only two paths: agree to cooperate with the prosecution

---

[5] Although a U.S. arrest warrant had been issued, those warrants (absent extenuating circumstances) are generally not valid outside of the United States. *See* Fed. R. Crim. Pro. 4(c)(2).

without seeing or being advised of the evidence against him, *or* return to Singapore and submit to prolonged detention while awaiting extradition proceedings the Government has not yet initiated. Neither is consistent with the interests of justice. The Government presumably wishes to try Mr. Durai, and Mr. Durai wishes to be tried. The only obstacle is the Government's insistence that the price of appearing to face charges is either cooperation or prolonged incarceration in Singapore before any judicial officer has evaluated the facts or even determined his fate under the Bail Reform Act. The facts are clear. Mr. Durai is not a fugitive. *See Bower v. El-Nady*, 844 F. Supp. 2d 191, 194 n.2 (D. Mass. 2012) (further explaining that term "fugitive from justice" is someone who refuses to return to the United States to avoid prosecution).

II.    **The Government's Refusal to Facilitate Mr. Durai's Appearance Violates His Fifth and Sixth Amendment Rights.**

A.  *The Government's conduct violates the Fifth Amendment.*

The Government has conditioned Mr. Durai's access to this Court on his willingness to cooperate, unconditionally and without any review of the evidence against him, with the prosecution. That is unconstitutional, as it conditions his constitutional right to appear and challenge the government's case on Mr. Durai's waiver of his Fifth Amendment right to testify in his own defense. *Simmons v. United States*, 390 U.S. 377, 394 (1968) (it is "intolerable that one constitutional right should have to be surrendered in order to assert another."); *United States v. Hernandez*, 504 Fed. Appx. 647, 648 (9th Cir. 2013) (vacated conviction that conditioned right to prevent "mistake of fact" defense with defendant's waiver of Fifth Amendment rights). The law is clear that Mr. Durai's right to appear and defend himself cannot be exchanged for a waiver of his Fifth Amendment right against self-incrimination.

The coercion does not end there. The Government revoked Mr. Durai's ESTA authorization, refused every alternative for entry, labeled him a "fugitive" based on the non-

15

appearance it has engineered, and then invoked that label to justify his continued refusal to act. *See* Background § VII, supra. The result is a "fundamentally unfair Hobson's choice": cooperate or submit to prolonged detention in Singapore pending extradition proceedings the Government has not initiated. *See United States v. Maldonado Rodriguez*, No. 25-cr-116-JJM-AEM, 2026 WL 84241, at *5 (D.R.I. Jan. 12, 2026), *appeal filed*, No. 26-1148 (1st Cir.) (court dismissed indictment *with prejudice* where government sought indictment shortly after defendant was deported because he secured bond under the bail reform act: "The Government's action here gives Mr. Maldonado Rodriguez a fundamentally unfair Hobson's choice—either remain detained by the Court so that he could have his preliminary hearing, or be released by the Court, only to have the Government (ICE) remove him from the country, thus denying him of his right to a preliminary hearing."). Here, like in *Maldonado-Rodriguez*, Mr. Durai is being kept out of the United States due to no choice of his own. Moreover, no judicial officer has evaluated the evidence, weighed the Bail Reform Act factors, or determined whether detention is warranted. The Government has imposed constructive pretrial detention through administrative action, bypassing 18 U.S.C. § 3142 and its rights entirely.

The Government is wielding immigration authority to prevent the very appearance its prosecutorial authority demands. If unintentional deprivation warranted dismissal of an indictment in *United States v. Castillo*, 537 F. Supp. 3d 120, 127–28 (D. Mass. 2021), where the Government deported a defendant without coordinating with the prosecuting office, the deliberate deprivation of access to the courts here *post*-indictment warrants relief at least as strong. And when the government bears responsibility for a person's inability to appear, it must make "greater exertions" to cure the problem it created. *United States v. Burden*, 934 F.3d 675, 686–88 (D.C. Cir. 2019). That principle, developed in the witness context, applies with greater force to a defendant, whose

absence implicates not just the right to confrontation but his rights to be present, to counsel, to due process and to a speedy trial.

The Government here has refused to undertake the "exertions" needed to bring Mr. Durai into the United States. Instead, it engineered Mr. Durai's absence and then weaponized it. Federal courts have not tolerated this. *See United States v. Urizar Lopez*, 587 F. Supp. 3d 835, 844 (S.D. Iowa 2022) (attributing delay to the government where ICE deported defendant while federal case was pending; dismissing with prejudice); *United States v. Parias*, No. CR 25-00904-FMO, 2025 WL 3749406, at *13 (C.D. Cal. Dec. 27, 2025) (same).

B.    *The Government's conduct violates the Sixth Amendment.*

Mr. Durai has been charged since November 4, 2025. He has not been arraigned. He has not had a bail hearing. He has not attended a single proceeding. The reason is not that he has chosen to be absent, but that the Government will not let him in.

The Sixth Amendment guarantees the right to be present at every critical stage of a prosecution, *Illinois v. Allen*, 397 U.S. 337, 338 (1970), and the right to counsel attaches when the indictment is filed, *United States v. Boskic*, 545 F.3d 69, 82-83 (1st Cir. 2008) (recognizing that Supreme Court has held that right to counsel commences with "formal charges" such as an indictment). That right is offense-specific, not location-specific. *Texas v. Cobb*, 532 U.S. 162, 168 (2001); *United States v. Osorio-Arellanes*, 112 F.4th 647, 662 n.9 (9th Cir. 2024) (noting right is "offense" not "location" specific). The deprivation is compounded by its timing: "[T]o deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985). The constitution further "imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance," and "the prosecutor and police have an affirmative obligation not to act in a

17

manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Id.* at 170–71. The Government has not even let Mr. Durai be arraigned.

The Government may argue that these protections do not extend to a foreign national abroad. Courts have rejected that position. In *United States v. Kashamu*, 15 F. Supp. 3d 854, 860 (N.D. Ill. 2014), the court held that "[t]he constitutional right to a speedy trial is triggered when an indictment is returned against a defendant," without conditioning that trigger on physical presence. The Sixth Amendment protects "the accused" in "all criminal prosecutions." *See* U.S. Const. Amend. VI. Mr. Durai is the accused. This is a criminal prosecution. The right has attached.

Courts have consistently held that when the government prevents a defendant from communicating with counsel and participating in his defense, the Sixth Amendment is violated and the remedy, generally, is dismissal of the indictment. *See United States v. Guimaraes*, No. 1:25-CR-10129-JEK, 2025 WL 1899046, *3 (D. Mass. Jul. 9, 2025) (court granted dismissal of indictment under Rule 48 because, by deporting the defendant to Brazil, her "removal by ICE has plainly infringed her Sixth Amendment right to the assistance of counsel in her defense, and dismissal of the indictment is an appropriate remedy"); *see United States v. Escobedo-Molina*, 790 F. Supp. 3d 1283, 1290 (D.N.M. 2025) (dismissing indictment with prejudice where defense counsel was "unable to speak with [the defendant] since he was deported"); *United States v. Rodriguez*, No. 4:25CR3041, 2026 WL 92922, at *3 (D. Neb. Jan. 13, 2026) (finding Government's removal violated the defendant's right to counsel). Mr. Durai's situation is no different.

The Sixth Amendment contemplates more than remote access to one's own defense. Counsel must be able to "communicate formal plea offers to the defendant, provide advice during the plea-bargaining process, describe risks in sentencing, give advice about the possibility of

deportation, assist in any attempt by the defendant to cooperate with the government, and consult with the defendant on lines of defense." *Guimaraes*, 2025 WL 1899046, at *5. Each of these functions is materially impaired when the defendant is stranded abroad. And this case demands more. This is a tippee securities fraud prosecution primarily under *Dirks v. SEC*, 463 U.S. 646 (1983). The central question is what Mr. Durai knew, when he knew it, and whether he understood that the information he received originated from a breach of fiduciary duty. The Indictment itself contains scant information regarding this critical issue. Preparing that defense requires iterative, real-time consultation—working through specific documents, testing recollections against a record spanning 33 million pages of discovery, and building a coherent theory across trades in at least eight companies, executed through contracts for difference on foreign platforms, across multiple jurisdictions and languages. What could take just days in a conference room will take weeks or months by correspondence and Zoom across a thirteen-hour time difference. A defense this complex cannot be conducted from overseas.

The prejudice extends beyond preparation. Mr. Durai cannot attend any proceeding before this Court. If a co-defendant has a court hearing that implicates him, the Government raises a new theory, or the Court asks a question requiring client input, counsel cannot consult the client. The Government has already raised cooperation—the most consequential decision Mr. Durai may face—requiring exactly the kind of iterative, in-person dialogue that his absence prevents. As a court within this Circuit recognized, "the situation leaves the Government holding all the cards and [the defendant] none." *Maldonado Rodriguez*, 2026 WL 84241, at *5. And Mr. Durai is "prejudiced by having a criminal charge open against him that he is unable to address through counsel or otherwise." *Castillo*, 537 F. Supp. 3d at 127.

### III.     The Government's conduct violates Mr. Durai's right to a speedy trial.

19

The Sixth Amendment right to a speedy trial attaches when a defendant is indicted. *United States v. Marion*, 404 U.S. 307, 320 (1971). Mr. Durai was indicted on November 4, 2025. More than five months have passed. He has not been arraigned, as the government has prevented him from even appearing. Whether government-caused delay violates the right to a speedy trial is governed by the four-factor balancing test of *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Each factor favors Mr. Durai.

**Length of delay**. Five months from indictment without so much as an arraignment is sufficient to trigger the *Barker* inquiry. Courts treat delay "approaching one year" as presumptively prejudicial, *Doggett v. United States*, 505 U.S. 647, 652 (1992), but that threshold assumes a case is progressing. Here, despite the case involving conduct that took place more than eight years ago, the Government has ensured no progress is possible.

**Reason for the delay**. *Barker* assigns the greatest weight to deliberate delay. 407 U.S. at 531. The Government has created and maintained Mr. Durai's absence. That is deliberate conduct entitled to the heaviest weight. In *Smith v. Hooey*, 393 U.S. 374, 382 (1969), the Supreme Court held that the government's mere failure to make a good-faith effort weighed against it. The Government here has done more than fail. It has obstructed.

**Assertion of the right**. Mr. Durai has asserted his right to appear from the earliest practicable moment. His counsel began proposing concrete mechanisms for appearance less than three weeks after unsealing. The Government rejected every one.

**Prejudice**. The conduct at issue is between six and eight years old. Each day that passes results in more memories fading and more documents subject to destruction. With respect to the evidence the Government has already collected, Mr. Durai cannot review 33 million pages of discovery, cannot meet with his attorneys, cannot attend proceedings at which co-defendants may

20

implicate him, and cannot participate in plea or cooperation discussions. He bears the ongoing burden of an unresolved federal indictment. This is precisely the prejudice *Barker* identified: "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the defense will be impaired." 407 U.S. at 532.

**IV.   This Court has authority to order the Government to facilitate Mr. Durai's appearance.**

The Constitution imposes on the Government an affirmative duty to make a good-faith effort to bring a defendant to trial. *Smith*, 393 U.S. at 383. Courts have extended that duty to defendants abroad. *See United States v. McConahy*, 505 F.2d 770, 773 (7th Cir. 1974); *United States v. Salzmann*, 417 F. Supp. 1139, 1166 (E.D.N.Y.), *aff'd*, 548 F.2d 395 (2d Cir. 1976) (dismissing with prejudice where defendant was abroad, repeatedly asked to return and face charges, and the government never responded; "[i]n light of this failure to even offer transportation to the United States to stand trial, it is hard to contend that the government has made a reasonable, good faith effort to procure [the defendant's] presence"). "[T]he government has no power to compel the presence of a foreign national residing outside the United States." *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990). The "onus" is therefore on the Government "merely to make it possible." *Id.* Mr. Durai has demanded to appear since December 3, 2025. The Government has made no effort at all. It revoked his ESTA authorization, rejected every alternative, and offered no mechanism for entry. The *Salzmann* court treated offering transportation as the bare minimum the government owed a defendant who wanted to appear. Mr. Durai offered to provide his own. The Government here has done worse than the government in *Salzmann*, which simply failed to respond. This Government responded, and it said no.

This district has dismissed indictments—whether under Fed. R. Crim. P. 12(b)(1) or 48(b) or otherwise—for exactly this kind of inaction. In *United States v. Rowbotham*, 430 F. Supp. 1254, 1257 (D. Mass. 1977), the court dismissed where "no effort has been made by the Government to return the defendant here for judicial process." In *Castillo*, 537 F. Supp. 3d at 127–28, this district dismissed where the government's own immigration action placed the defendant beyond the court's reach. In *United States v. El Naddaf*, 662 F. Supp. 3d 108, 136 (D. Mass. 2023), the court held that "the government should have, at the minimum, attempted to reach Mr. El Naddaf to put him on notice of the charge against him and allow him to return to the United States to face it." Mr. Durai did not wait to be reached. He retained counsel, initiated contact, and spent months proposing concrete mechanisms for his appearance. The Government rejected every one. *See also United States v. Tamup-Tamup*, No. 25-cr-0066, 2025 WL 2662293 (D.R.I. Sept. 17, 2025), *appeal filed*, No. 25-2004 (1st Cir.) (dismissing indictment with prejudice where government chose to charge the defendant with federal crimes, but then deported him before he could answer the charges). The Government here has done worse. It has not merely failed to act—it has affirmatively blocked every path to the courtroom.

The Government may cite *United States v. Hijazi*, 845 F. Supp. 2d 874, 914 (C.D. Ill. 2011), for the proposition that a defendant abroad "can be held responsible for the delay." But *Hijazi* never proposed any mechanism to appear and never engaged in months of negotiations over surrender. And the government in that case exercised due diligence—issuing a Red Notice and making a formal request to Kuwait. It tried and failed. The Government here has succeeded—in keeping Mr. Durai out.

This Court's authority to act is well-established. In *United States v. Moussaoui*, 382 F.3d 453, 476 (4th Cir. 2004), the Government argued that enemy combatant witnesses held abroad

22

were beyond the court's reach. The Fourth Circuit rejected that argument, holding that when an evidentiary privilege "is asserted by the Government in the context of its prosecution of a criminal offense," the defendant's rights prevail. The burden there was extraordinary. The burden here is trivial: Mr. Durai is asking to board a plane to Boston. And as the Supreme Court held in *Degen v. United States*, 517 U.S. 820, 828–29 (1996), the Government may not invoke judicial power on its own terms while shielding itself from its obligations. The Government prosecutes Mr. Durai while blocking every path to the courtroom, producing exactly the kind of indefinite limbo that federal criminal procedure is designed to prevent.

Last, the relief sought is neither novel nor beyond the powers of the DOJ. In *United States v. Vorley*, No. 18-cr-35 (N.D. Ill.), DOJ facilitated the voluntary appearance of two foreign nationals charged with commodities fraud while residing abroad. In *United States v. Sidoo*, No. 19-10080-NMG (D. Mass.), a Canadian citizen self-surrendered in this district. In each case, the Government took the necessary administrative steps without requiring cooperation as a precondition. The Government's position here is not that facilitation is impossible—it has told defense counsel that it *can* facilitate Mr. Durai's entry but only if he unconditionally chooses to waive his constitutional rights to self-incrimination and agree to cooperate prior to his arrival and prior to knowing what the evidence is against him. Its position is that it will withhold facilitation *unless* Mr. Durai cooperates. Conditioning a defendant's ability to appear in his own case on his willingness to waive his constitutional rights and assist the prosecution is coercion, not discretion.

## V.    This Court Should Dismiss or Stay the Prosecution.

If the Government continues to refuse to facilitate Mr. Durai's appearance, this Court must impose a remedy. That remedy is either dismissal of the Indictment under Rule 48(b) or stay of

23

the Indictment. *See* Rule 48(b) (court may dismiss indictment if "unnecessary delay occurs in … bringing a defendant to trial.).

A.  *This Court's supervisory powers warrant dismissal.*

A federal district court may dismiss an indictment under its supervisory powers "when the investigatory or prosecutorial process has violated a federal constitutional or statutory right and no lesser remedial action is available." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991); *see United States v. Hasting*, 461 U.S. 499, 505 (1983). Both conditions are met. The Government's conduct has violated Mr. Durai's rights under the Fifth and Sixth Amendments, and those violations will continue for as long as the Government maintains the prosecution while refusing to allow him to defend it.

Courts confronting analogous facts have consistently dismissed indictments. In *Escobedo-Molina*, 790 F. Supp. 3d at 1289–94, the court dismissed with prejudice after the Government's removal of the defendant violated his Fifth and Sixth Amendment rights. *See also Parias*, 2025 WL 3749406, at *13 (dismissing with prejudice where ICE obstructed access to counsel); *United States v. Galvan-Orea*, 766 F. Supp. 3d 740, 745–46 (E.D. Mich. 2024) (dismissing without prejudice even where removal was mandatory under the INA). In this Circuit, *Castillo* dismissed after finding the Government had "abandoned" the prosecution by choosing removal and warned that continued noncompliance would warrant dismissal with prejudice. 537 F. Supp. 3d at 127–28, 131. Courts have since followed through. In *Guimaraes*, 2025 WL 1899046, at *5, the court dismissed the indictment with prejudice because:

> ICE denied Guimaraes the procedural protections of an arraignment by failing to facilitate her appearance at her April 23, 2025 arraignment before she was deported. The arraignment, governed by Federal Rule of Criminal Procedure 10, "is intended to be a safeguard for due process." *Merritt v. Hunter*, 170 F.2d 739, 741 (10th Cir. 1948). The Supreme Court has described an arraignment as "a sine qua non to the trial itself," because it is "the preliminary stage where the accused is informed of

24

the indictment and pleads to it, thereby formulating the issue to be tried." *Hamilton v. Alabama*, 368 U.S. 52, 54 n.4 (1961). An arraignment must take place in open court, and during the hearing, the court must ensure that the defendant has received a copy of the indictment or information and has the opportunity to have the charging document read to her. *See* Fed. R. Crim. P. 10(a). By refusing to produce Guimaraes for her arraignment before deporting her to Brazil, notwithstanding the AUSA's conveyance of the information regarding the hearing, ICE denied Guimaraes the basic right to be informed of the charge pending against her in the indictment.

Here, the DOJ is denying Mr. Durai's ability even to be arraigned for his alleged crimes, which is a basic constitutional and procedural right "to be informed of the charge pending" against him "in the Indictment." *See also Tamup-Tamup*, 2025 WL 2662293, at *2 (dismissing with prejudice: "the executive branch must make an election: prosecution or release to the detainer … their choice has consequences"); *Maldonado Rodriguez*, 2026 WL 84241, at *5 (same); *United States v. Linarez-Lugo*, No. 2025-CR-0006, 2026 WL 370852, at *3 (D.V.I. Feb. 10, 2026) (same).

Mr. Durai's case is stronger. In each of those cases, the Government at least had a competing statutory obligation—removal under the INA—that it chose to prioritize. Here, the Government has no such obligation. It simply refuses to act. And it is intentionally acting to deny Mr. Durai's ability to even be arraigned on the charges against him. That is not a conflict between competing mandates. It is a choice to maintain a prosecution while blocking the defendant from defending it.

### B.   *In the alternative, this Court should stay the prosecution.*

If this Court concludes that dismissal is premature, it should stay the prosecution and order the Government to facilitate Mr. Durai's appearance within a date certain. Other courts have proceeded directly to dismissal. *See, e.g., United States v. Perez-Canez*, No. 18-00229-PHX, 2020 WL 1000029, at *3 (D. Ariz. 2020); *Urizar Lopez*, 587 F. Supp. 3d at 845; *Escobedo-Molina*, 790 F. Supp. 3d at 1290. Mr. Durai asks this Court to act before that step becomes necessary. The Government should be ordered to facilitate entry—whether through parole under 8 U.S.C. §

1182(d)(5), coordination with DHS, or any other mechanism within its authority—and to report within thirty days and complete facilitation within sixty. *See United States v. Donnelly*, 41 F.4th 1102, 1107 (9th Cir. 2022) (ordering government to act within seven days after months of noncompliance, holding that failure would leave "no lesser remedial action" than dismissal). If the Government acts, the prosecution proceeds. If it does not, dismissal becomes the only remaining remedy—not as a sanction, but because a prosecution in which the defendant cannot participate is no prosecution at all.

26

**CONCLUSION**

Mr. Durai has been under indictment for more than five months. He has not been arraigned. He has not had a bail hearing. He has not attended a single proceeding. Not because he has refused to appear, but because the Government will not let him.

Within weeks of learning of the charges, Mr. Durai retained counsel, proposed multiple concrete mechanisms for voluntary surrender, and ultimately asked to be paroled into the country with no conditions at all. The Government rejected every proposal. It revoked his travel authorization, refused every alternative, and then labeled him a fugitive based on the absence it engineered. It offered two paths: cooperate or submit to prolonged detention in Singapore pending extradition proceedings it has not initiated. Neither is consistent with the Constitution.

The Government has a duty to make a diligent, good-faith effort to bring a defendant to trial. It has made no effort. It has done worse than nothing—it has affirmatively blocked the defendant from appearing in the prosecution it chose to bring. That conduct violates Mr. Durai's rights under the Fifth and Sixth Amendments, and it is incompatible with the architecture of federal criminal procedure.

This Court has the authority to remedy these violations. Mr. Durai asks it to do so. For all these reasons, Defendant Dev Ananth Durai respectfully requests that this Court enter an order:

1. Ordering the Government to facilitate his entry into the United States for the purpose of presentment, arraignment, and all further proceedings, by one or more of the following means: (a) coordinating with Customs and Border Protection and the Department of Homeland Security to authorize Mr. Durai's boarding and entry at a United States port of entry; (b) making a request for parole under 8 U.S.C. § 1182(d)(5) for the limited purpose of entry, immediate surrender, and court appearance; or (c)

taking other administrative steps within the Government's authority necessary to permit Mr. Durai's lawful entry without requiring him to first submit to detention in a foreign jurisdiction;

2. Requiring the Government to report to this Court on the status of its facilitation efforts within 30 days of the Court's order, and to complete facilitation within 60 days;

3. In the alternative, ordering that the Indictment be dismissed with prejudice. If this Court concludes that dismissal is premature, dismissing the indictment and staying all proceedings against Mr. Durai until such time as the Government takes the steps necessary to bring him before this Court; and,

4. Granting such other and further relief as this Court deems just and proper.

Dated: April 14, 2026

Respectfully submitted,

By: /s/ *Eric S. Rosen*
Eric S. Rosen
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

Robert Fisher
**NIXON PEABODY LLP**
Exchange Place
53 State Street
Boston, MA 02109
(617) 345-1335
rfisher@nixonpeabody.com

*Counsel for Defendant Dev Ananth Durai*

28

## <u>CERTIFICATE OF SERVICE AND CONFERENCE</u>

I hereby certify that on April 14, 2026, a true and correct copy of the foregoing document was served by e-filing upon counsel of record. Further, the Government does not agree to the relief requested herein.

<u>/s/ Eric S. Rosen</u>
Eric S. Rosen
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

29